UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

DARBI BODDY,

    Plaintiff,

vs.

MARY GRECH, *et al.*,

    Defendants.

Case No. 3:24-cv-327

District Judge Michael J. Newman
Magistrate Judge Peter B. Silvain, Jr.

___

**ORDER: (1) DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (Doc. No. 2); (2) TERMINATING AS MOOT PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER; AND (3) REFERRING THIS MATTER TO UNITED STATES MAGISTRATE JUDGE CAROLINE H. GENTRY FOR MEDIATION**

___

Plaintiff Darbi Boddy seeks a preliminary injunction requiring Defendants—the Xenia, Ohio Community Schools Board of Education ("the Board") and its president, Mary Grech—to allow her to speak during one or more future Board meeting consistent with the guarantees of the First Amendment to the Constitution's Free Speech Clause.  For the reasons more fully set forth below, the Court **DENIES** Plaintiff's motion because a preliminary injunction is an "extraordinary" remedy, *see infra*, § II; because some evidence favors Plaintiff while other evidence favors Defendants; and because Plaintiff has not satisfied her burden to show the applicable factors clearly demand immediate preliminary injunctive relief.  *See infra*, §§ II-IV.

The relevant background of this matter is as follows:  Plaintiff does not live in or near Xenia, Ohio nor does she have children who attend Xenia Community Schools.[1]  Nonetheless, as a concerned member of the public, she was permitted to speak—like members of the Xenia

___

[1] Plaintiff is a member of the Board of Protect Ohio Children and a leader of Moms for America in Butler County, Ohio.  Doc. No. 1 at PageID 9.

community—on school/educational matters at the October 14, 2024 School Board meeting, which was open to the public. She chose to speak in support of one Board member who wanted the Board and Xenia Community Schools Superintendent, Dr. Gabriel Lofton, to authorize and pay for an audit to prove Critical Race Theory ("CRT") was, or was not, in the Xenia Community Schools curriculum.[2]

When it was Plaintiff's turn to speak during the October 14th Board meeting, and believing the Board and Dr. Lofton were not supportive of a CRT audit, she began by criticizing the Board and the Superintendent. Some members of the public in attendance loudly voiced their disapproval. Within a short time, the Board recessed. Plaintiff, however, had not concluded her remarks to the Board, and the Board's five-minute time limit—given to speakers such as Plaintiff—had not expired. (As best the Court can determine from a careful review of the evidence, Plaintiff spoke for approximately 1 minute and 35 seconds by the time of the recess and after the microphone was taken away, and she then spoke for approximately an additional 2 minutes and 25 seconds. Plaintiff's Exhibit 1.)

Plaintiff brings the instant case pursuant to 42 U.S.C. § 1983[3] asserting that Defendants interrupted and curtailed her remarks in violation of her rights under the First Amendment's Free Speech Clause.

---

[2] For a discussion of what CRT is, see Kindaka Sanders, *The Red Pill: Critical Race Theory, Ostrich Law, and the Fourteenth Amendment Right to Free and Equal Thought and Dignity*, 55 St. Mary's Law Journal 147, 157-59 (2024).

[3] Plaintiff does not seek to recover monetary damages under § 1983.  *See* Doc. No. 1 at PageID 20-21. Consequently, the case does not involve qualified immunity.  *See J. Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281, 302 (6th Cir. 2019) ("[Q]ualified immunity only immunizes defendants from monetary damages—not injunctive or declaratory relief." (cleaned up) (quoting *Kanuszewski v. Mich. Dep't of Health and Human Servs.*, 927 F.3d 396, 417-18 (6th Cir. 2019))).

2

The case is before the Court, as noted, upon Plaintiff's motion for a preliminary injunction (Doc. No. 2), and Defendants' memorandum in opposition (Doc. No. 9). On January 8, 2025, the Court held a hearing on Plaintiff's motion during which the parties, through counsel, presented witness testimony, video and audio recordings, and other evidence. *See* Doc. No. 17. The parties then filed post-hearing briefs. Doc. Nos. 19, 20. Accordingly, Plaintiff's motion is now ripe for review.

Plaintiff seeks an Order requiring the Board and Grech to permit her to speak at one or more future Board meetings for the full five minutes. *See* Doc. No. 2 at PageID 28.[4] Plaintiff's motion raises important constitutional concerns. *See, e.g., Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 892-94 (6th Cir. 2021); *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432-36 (6th Cir. 2009). First Amendment principles; the "extraordinary" relief Plaintiff now seeks; and the parties' competing contentions require careful consideration of the issues presented, which the Court has undertaken here. *See infra* §§ II-IV.

## I. Background

### A. The Underlying Controversy

The controversy underlying Plaintiff's comments during the October 14th Board meeting arise from Board member Jeremy Cox's repeated requests to hire a consultant to perform a particular type of curriculum audit—one designed to determine if CRT is taught in the Xenia Community Schools. *See* Doc. No. 17 at PageID 161-66. During a previous Board meeting, in September 2024, Dr. Gabriel Lofton, Superintendent of Xenia Community Schools ("the Superintendent"), declined to recommend hiring an outside consultant to conduct a CRT audit, and

---

[4] The full preliminary injunction Plaintiff seeks appears in her motion for preliminary injunction. Doc. No. 2 at PageID 28-29 (capitalization omitted).

3

the Board voted against paying for such an audit. *See id*.

Plaintiff alleges the School District holds an anti-American ideology. Doc. No. 1 at PageID 9-10. This purported anti-American ideology includes, according to Plaintiff, "DEI (diversity, equity, and inclusion) and/or [CRT.]" *Id*. at PageID 5. She also alleges in her complaint, "certain elements of the uber-liberal educational cabal which dominate public education today have taken a hostile attitude towards … efforts" to challenge whether CRT is taught in Xenia Community Schools and to determine whether school curriculum promotes teaching DEI or CRT. *Id*.

### B. The Superintendent's Testimony

During the preliminary injunction hearing, Superintendent Lofton testified that Board member Cox had, for approximately one year, repeatedly raised issues with him related to CRT and the Xenia Community Schools' curriculum. Doc. No. 17 at PageID 161-62. After Cox repeatedly raised many of these questions (a "barrage" according to the Superintendent), and after the Superintendent tried to address Cox's concerns, Cox eventually asked the Superintendent to hire an outside consultant to perform a CRT audit. *See id*. Cox wanted the consultant to determine whether or not CRT is taught in the school district. *See id*. at PageID 162.

The Superintendent testified that he told Cox, "the community needs to understand what you're asking, because this is a very divisive issue; and, quite frankly, you haven't given me any evidence … to suggest that Critical Race Theory [is] present [or taught in our schools]." *Id*. at PageID 165. The Superintendent further testified, "I knew … this was going to be a divisive issue that the community … was going to have issues about on both sides of the aisle. You know, those who were for, and those who were against." *Id*. at PageID 167.

Prior to the October 14th Board meeting, the Superintendent emailed a letter to parents advising that "Critical Race Theory is not being taught in our classrooms. To be clear, Critical

4

Race Theory is not being taught now, and has not been taught in the past." Plaintiff's Exh. 4.

The topic of CRT was placed on the Board's agenda for October 14th meeting, and more people than usual attended, including Plaintiff. Doc. No. 17 at PageID 186, 230.

### C. The Board's Policies

The Board's policy No. 0169.1 permits public participation during Board meetings. *See* Plaintiff's Exhibit 1 at p. 1. This policy places the duty on the Board's presiding officer to administer Board rules. *Id*. One rule sets a five-minute time limit for "[e]ach statement made by a participant[.]" *Id*. Another rule declares, "All statements shall be directed to the presiding officer; no person may address or question Board members individually." *Id*. at p. 2.

The presiding officer may take certain actions during the public participation portion of a Board meeting. He or she may:

1. interrupt, warn, or terminate a participant's session when they make comments that are repetitive, obscene, and or comments that constitute a true threat (i.e., statements meant to frighten or intimidate one … or more specified persons into believing that they will be seriously harmed by the speaker or someone acting at the speaker's behest)[;]

2. request any individual to stop speaking and/or leave the meeting when that person does not observe reasonable decorum or is disruptive to the conduct and/or orderly progress of the meeting[;]

3. request the assistance of law enforcement officers in the removal of a disorderly person when that person's conduct interferes with the orderly progress of the meeting; [or]

4. call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action….

*Id*. at ¶ L.

5

### D.  The Video and Additional Testimony

During the preliminary injunction hearing, counsel presented a short video of the events that occurred when Plaintiff spoke during the October 14th Board meeting.[5]  During the preliminary injunction hearing, witnesses testified about what this short video depicts.  It begins with Plaintiff standing at a podium facing the Board members with members of the public sitting in rows behind her.

One of Plaintiff's initial comments referred to the "failing Xenia Board of Education," and the "cowardice [sic] superintendent who did not perform adequately in his role."  Within seconds thereafter, Grech firmly said, "Excuse me, excuse me ma'am, I will cut your mic."  Slightly after Grech began to say this, some members of the public began to speak out, including someone saying, "no, no."  Plaintiff testified that she did not hear Grech's warning about cutting the mic.  Doc. No. 17 at PageID 293.

After Grech's warning about cutting the microphone, members of the public quieted somewhat, while Plaintiff spoke for approximately thirty-five seconds more, saying,

> This superintendent reprimanded the one good board member who was doing [his] due diligence and asking questions so he could better understand the teaching environment, make educated decisions to determine what is best for the students of Xenia and therefore help create an educational environment free of racism and division, as is his job per ORC [Ohio Revised Code] and school policy.
>
> It appears quite obvious this board and superintendent do not advocate for transparency and want to continue pushing racist and divisive ideologies to the children of Xenia and indoctrinate them into an anti-American agenda[.]

These comments stirred some members of the public to begin talking with each other and make louder comments.  One person began to loudly "boo"; another complained, "she's out of

---

[5] Unless otherwise indicated by citations to other documents in the case record, the following description is based on the events shown in the video, Plaintiff's Exhibit 1.

order"; and a third shouted, "go home." One person implored, "stop interrupting," apparently wanting to hear further remarks from Plaintiff. Plaintiff did not yell; she continued to speak using a calm tone and manner as she had since starting her remarks.

Plaintiff spoke for about another twenty seconds. Grech then walked to the podium where Plaintiff was using a microphone and physically removed the microphone from the podium. One person shouted, "Thank you, Mary." Many of those present began applauding, while Plaintiff continued to talk without the microphone.[6]

As Plaintiff spoke, Grech made a motion for the Board to recess. Doc. No. 17 at PageID 279. The Board voted four to one in favor of a recess. *Id*. at PageID 283. Meanwhile, Plaintiff remained at the podium, speaking as the Board members exited the room. Some members of the public continued to shout comments. One shouted, "nobody's listening"; another responded, "yes we are"; a third shouted, "You got two more minutes, keep talking." By now, after the Board had recessed, and left the meeting room, Plaintiff turned and faced the members of the public as she spoke. She soon concluded her remarks. Although a deputy sheriff can be seen walking near her, he did not attempt to interact with her or remove her from the room. He also did not physically remove or restrain anyone present.

Grech acknowledged during her hearing testimony that it was possible her threat to "cut [the] mic" may have helped "rile up" the audience. Doc. No. 17 at PageID 278. Grech directed her comment only to Plaintiff, not to the audience. *Id*. Grech also explained that she responded to Plaintiff in this way because Plaintiff "was starting down a path of calling … names[.]" According to Grech, "[T]he way [Plaintiff] was giving her speech and directing it strictly to the

---

[6] Without a microphone on the podium, the substance of Plaintiff's comments cannot be clearly heard when viewing the video.

7

Superintendent…, that's [sic] goes to decorum. It goes to the -- just inciting the crowd basically[.]" Doc. No. 17 at PageID 242. Grech continued, "And then the ineffectual -- [Plaintiff] had started talking about the ineffectual -- it was her tone. It was … the way she was clearly not -- it was how she was talking. It was not what she was saying. It was how she was talking, and she was directing her comments directly to the Superintendent." *Id*. at PageID 243.

Twenty-one people spoke during the public-comment portion of the October 14th Board meeting. *Id*. at PageID 255. Grech testified that she admonished one speaker (who spoke prior to Plaintiff) for directing her comments to Cox rather than to Grech or the Board. *Id*. at PageID 240-41. When the Board returned from its recess, Plaintiff did not ask for another opportunity to speak, and Grech did not offer her one. The meeting instead continued with other members of the public addressing the Board. Plaintiff testified that two speakers—Kim Georgeton and Cory Ford—spoke in favor of Cox and a CRT audit. *Id*. at PageID 310-11. According to Plaintiff, members of the public did not interrupt either Georgeton or Ford during their comments. *Id*.

Plaintiff testified that she would like to speak during a future Board meeting but feels threatened and uncomfortable "going to the Board and speaking." *Id*. at PageID 314. She feels she was unable "to speak to the Board with [her] full speech and express [her] concerns appropriately." *Id*. Plaintiff acknowledged that no one with the Board has indicated she cannot speak again during a future Board meeting. *Id*. Plaintiff believes she has "the right to be critical of the School Board," including using names or epitaphs like "tyrant." *Id*. at PageID 316.

## II. Preliminary Injunctions

Preliminary injunctions are "extraordinary remed[ies] never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). They have "been characterized as 'one of the most drastic tools in the

8

arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.,* 781 F.2d 264, 273 (2d Cir. 1986)).

Courts issue a preliminary injunction "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The burden of "proof required for [a] plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), *abrogated in part on other grounds by EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025) (citing *Winter*, 555 U.S. at 7)*; see McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). "This is because the preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it.'" *Id*. (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1991)).

A four-factor test applies in this circumstance. "To secure a preliminary injunction, a plaintiff 'must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest.'" *EOG Res., Inc.,* 134 F.4th at 874 (quoting *Winter*, 555 U.S. at 20).

"Because preliminary injunction are extraordinary remedies, the plaintiff bears the burden to justify relief, even in First Amendment cases." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d

9

281, 288 (6th Cir. 1998). "With regard to the factor of irreparable injury[,] it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id*. (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) then citing *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief")).

### III. Analysis

#### A. Section 1983

The statute under which Plaintiff brings her First Amendment claim, 42 U.S.C. § 1983, creates a cause of action "allowing individuals to vindicate violations of their constitution rights." *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 870 (6th Cir. 2024). To prove a claim under § 1983, "a plaintiff must first identify a constitutional right, then show that a person acting under the color of state law deprived him [or her] of that right." *Id*.

Plaintiff has identified the constitutional right she seeks to vindicate—her right to free speech under the First Amendment.[7] Doc. No. 1 at PageID 15-16. In their pleadings, the parties dispute whether Defendants acted under color of state law. *Compare id*. at PageID 4 *with* Doc. No. 16 at PageID 137. For purpose of deciding the instant request for injunctive relief, the Court assumes, in Plaintiff's favor, that the Board and Grech did, in fact, act under the color of state law. *See* Ohio Rev. Code § 3313.17.

---

[7] Plaintiff raises an as-applied challenge to the Board's policies. *See* Doc. No. 20 at PageID 394; *see also* Doc. No. 2. It is unclear whether Plaintiff also raises a facial challenge to a Board policy in her motion. *See* Doc. Nos. 2, 20. She has therefore waived a facial challenge to any Board policy as a basis for seeking a preliminary injunction. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## B. The First Amendment's Free Speech Clause

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from 'abridging the freedom of speech.'" *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (quoting U.S. Const. amend. I). "The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs." *Ison*, 3 F.4th at 893 (citing *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n. 11 (2010)).

In the present case, the Board meeting on October 14, 2024 occurred in a limited public forum.[8] *See Lowery*, 586 F.3d at 432 ("The school board meeting at issue in this case falls in the middle [between a traditional public forum and a non-public forum]"); *see also Ison*, 3 F.4th at 893 ("The parties here agree that the Board meetings constitute a 'limited public forum,' meaning it 'is limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470, (2009))).

> In a limited public forum, the government may "regulate features of speech unrelated to its content" through "time, place, or manner" restrictions. It has "wide leeway" to do so, and those restrictions survive if "they are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information."
>
> The government may also impose content-based restrictions, such as those reserving the forum "for certain groups or for the discussion of certain topics," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829…, (1995), so long as they "are reasonable in light of the purpose served by the forum and are viewpoint neutral[.]" But "the government may not engage in a more invidious kind of content discrimination known as 'viewpoint discrimination.' Impermissible viewpoint discrimination "does not neutrally treat an entire subject as off limits," but rather "permits some private speech on the subject and only disfavors certain points of view."

---

[8] Plaintiff spoke during the public comment portion of the Board meeting. She acknowledges she spoke to the Board in a limited public forum. Doc. No. 20 at PageID 376.

11

*Ison*, 3 F.4th at 893 (brackets omitted) (quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)).

### C. Plaintiff's Likelihood of Success

Plaintiff contends there is a strong likelihood she will succeed in demonstrating that Grech and the Board engaged in impermissible viewpoint discrimination in violation of the First Amendment due to their actions, (1) as seen in the video of the October 14th hearing and (2) as explained when she testified at the preliminary injunction hearing. Doc. No. 20 at PageID 380-86. Plaintiff argues, "Clearly the controversial aspect of [my] comment[s] arose from the language [I] used and to whom it was directed[.]" *Id*. at PageID 386. Plaintiff points to her comments about the "'cowardice superintendent[,]' and the failing Xenia Board of Education[,]'" *id*. at PageID 386, and her criticism that "this board and superintendent do not advocate for transparency and want to continue pushing racist and divisive ideologies to the children of Xenia and indoctrinate them into an anti-American agenda[.]'" *Id*. Plaintiff further contends Grech and the Board failed to control, and instead ratified and condoned, the "heckler's veto"[9] perpetrated against Plaintiff by members of the public. *Id*. at PageID 386-87.

Defendants argue Plaintiff is not likely to show they violated her First Amendment rights because she disrupted the Board meeting on October 14th, causing the need to recess the meeting to restore order. Doc. No. 21 at PageID 369. Defendants maintain they properly acted in reliance on the Board's "public participation policy that allows the presiding officer to interrupt, warn, or terminate a participant's session if the person does not observe reasonable decorum or is disruptive to the conduct and/or orderly progress of the meeting." Doc. No. 21 at PageID 369. Defendants

---

[9] "A heckler's veto involves burdening or punishing speech 'simply because it might offend a hostile mob.'" *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 977 F.3d 530, 544 (6th Cir. 2020) (quoting *Forsyth Cty. v. Nat'l Movement*, 505 U.S. 123, 134-35 (1992)).

12

also contend the rule against ratifying or condoning a heckler's veto does not apply to limited forums, like the Board meeting on October 14th. *Id*.

Having reviewed the matter carefully, the Court finds Plaintiff has not made a clear showing that she is likely to succeed on the merits of her First Amendment free speech claim. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) ("[A] plaintiff seeking a preliminary injunction must make a clear showing that 'he [or she] is likely to succeed on the merits….'" (quoting W*inter*, 555 U.S. at 20)). This is mainly because the evidence presented during the preliminary injunction hearing at times favors Plaintiff on the merits of her First Amendment claim and at other times favors Defendants.

Viewing Plaintiff's initial comments in her favor, her characterization of the Board as "failing" criticized the Board for not acting as she thought it should. Similarly, her reference to the "cowardice [sic] superintendent who did not perform adequately in his role," criticized the Superintendent's job performance. Such criticisms, in the limited public forum of the Board meeting, carry some First Amendment protection. "[T]he board may not exclude speech merely because it criticizes school officials," *Lowery*, 586 F.3d at 435, or "purely because it disparages or offends." *Ison*, 3 F.4th at 894. "Save for rare circumstances—say, speech promoting drug use at a high school event, *see Morse v. Frederick,* 551 U.S. 393, 403 (2007)—the First Amendment forbids government officials from regulating speech based on their reaction to its point of view." *Lowery*, 586 F.3d at 435 (citing *Mosley,* 408 U.S. at 96). Plaintiff's remaining remarks—specifically, her assertion, "this board and superintendent do not advocate for transparency and want to continue pushing racist and divisive ideologies to the children of Xenia and indoctrinate them into an anti-American agenda"—likewise express criticisms of the Board and Superintendent that the First Amendment generally protects. *See id*.

Yet, this First Amendment protection may yield in Defendant's favor if Plaintiff aimed a verbal ad hominem attack directly at a specific individual. In *Ison*, the Sixth Circuit, in dicta, noted it was not "decid[ing] … that regulations guarding against actual ad hominem *attacks*, even verbal, are not permitted in a limited public forum. Suffice it to say that speaking out in opposition to an idea may be offensive but is easily distinguishable from a personal attack." 3 F.4th at 894, n. 1 (emphasis in original) (citing *Bible Believers v. Wayne County*, 805 F.3d 228, 246-47 (6th Cir. 2015) (en banc) (distinguishing between generally offensive statements and "insult or offense" directed specifically at an individual)). Plaintiff aimed the pejorative term "cowardice" directly at the Superintendent. Her remark thus contained an "insult or offense"—an ad hominem attack—"directed specifically at an individual." *Id*. Isolating Plaintiff's comment in this manner favors Defendants because curtailing such speech does not violate the First Amendment, at least according to *Ison*'s dicta and *Bible Believers*. 805 F.3d at 246-47.

Setting this problem aside, the evidence also presents competing issues over whether Plaintiff's comments disrupted the Board meeting or whether Defendants curtailed her speech because they disagreed with her criticisms of the Superintendent and the Board. "'Although the school board may exclude some types of 'harassing' speech[,] if it has the potential to disrupt the meeting[,] the board may not exclude speech merely because it criticizes school officials." *Lowery*, 586 F.3d at 435. Common sense likewise cautions, "[f]or a school board to function, it must be able to keep its meetings in order[.]" *Id*. at 436.

One way to assess the evidence is that Plaintiff's remarks caused the disruptions that led Grech to act and the Board to recess. However, at this early stage of the case, the evidence on this is mixed. Grech acknowledged during her hearing testimony that her threat to cut Plaintiff's mic may have helped "rile up" the audience. Doc. No. 17 at PageID 278. Grech also acknowledged

14

that she disagreed with Plaintiff's view of the Board and Superintendent as ineffectual. *Id*. at PageID 268. Grech testified, "[Plaintiff] was definitely … insulting myself and the Board, and the manner in which she was presenting her comments [was] offensive." *Id*. at PageID 347-48. If Grech interrupted or ended Plaintiff's comments to the Board because Plaintiff's criticisms were insulting or offensive, Grech's actions ran afoul of the First Amendment. *See Ison*, 3 F.4th at 894 ("These terms ['abusive,' 'insulting'] plainly fit in the 'broad' scope of impermissible viewpoint discrimination because … they prohibit speech purely because it disparages or offends").

Further, Grech testified that she did not curtail Plaintiff's speech because she disagreed with Plaintiff's comments. Grech explained she acted because of Plaintiff's "lack of public decorum" and because Plaintiff "was addressing only the Superintendent[.]" *Id*. However, the video of Plaintiff's remarks, when viewed in Plaintiff's favor, may show she did not engage in overt behavior consistent with a lack of reasonable decorum. She talked without yelling and appears to use a manner and tone appropriate to the circumstances. It is also not readily apparent from the video that Plaintiff directly addressed the Superintendent by looking at him as she spoke. Most of the time, she appeared to read from notes on her cellphone. Even if she addressed some of her criticisms directly to the Superintendent, that alone does not negate the protection the First Amendment provides to her criticisms.[10] *Cf. Ison*, 3 F.4th at 895 ("The restrictions on 'antagonistic,' 'abusive' and 'personally directed' speech prohibit speech because it opposes, or offends, the Board or members of the public, in violation of the First Amendment"). The video reveals that Grech directed her warnings only to Plaintiff, not to other members of public, even though Plaintiff's tone and manner of speaking were not obviously disruptive. All this evidence

---

[10] This does not include her ad hominem attack directed specifically at the "cowardice superintendent." *See Ison*, 3 F.4th at 894, n. 1.

points to Grech's possible mixed motives for curtailing Plaintiff's speech, and "the mixed-motive inquiry is one for the jury … to decide[,]" as the Sixth Circuit made clear in *Lowery*, 586 F.3d at 435 (citations omitted), a First Amendment case involving speech, like here, in a limited public forum. *See id*.

This leaves Plaintiff's argument concerning the heckler's veto. Plaintiff relies on the explanation in *Bible Believers* that "'constitutional rights may not be denied simply because of hostility to their assertion or exercise." Doc. No. 20 at PageID 389. "Simply stated, the First Amendment does not permit a heckler's veto." *Id*. (quoting *Bible Believers*, 805 F.3d at 252). The problem Plaintiff avoids is that the heckler's veto at issue in *Bible Believers* occurred in a traditional public forum, *see Bible Believers*, 805 F.3d at 242, where "the government's regulatory powers are at their weakest[.]" *Lowery*, 586 F.3d a 432. This contrasts with the limited public forum at issue in the instant case, where the Board holds a legitimate and common sense desire "to keep its meetings in order[.]" *Id*. at 436. Still, caution must be taken at this early stage of the case not to draw final conclusions about Plaintiff's heckler's veto argument. The Court has a limited, and disputed, record before it at this early stage of the case. Additionally, the Court is not convinced, at this early stage, that a heckler's veto in a limited public forum—as a matter of law— never violates the First Amendment. *See Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 502 (9th Cir. 2015) ("The 'heckler's veto' concerns … would be troubling in a traditional or designated public forum, but they do not carry the same weight in a limited public forum…. That does not mean 'heckler's veto' concerns have no relevance in a limited public forum: A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view"). Given this, the evidence possibly showing Grech held mixed motives for curtailing Plaintiff's speech may likewise show

16

that she permitted a heckler's veto to stifle Plaintiff's speech in violation of the First Amendment.

For all the above reasons, and at best for Plaintiff, the evidence currently in the record shows she might eventually prevail in her First Amendment claim against Defendants, but the evidence falls short of clearly showing she is likely to succeed on the merits of her First Amendment claim. *See Starbucks Corp.*, 602 U.S. at 346 (2024) ("a plaintiff seeking a preliminary injunction must make a clear showing that 'he [or she] is likely to succeed on the merits….'" (quoting *Winter*, 555 U.S. at 20); *McNeilly*, 684 F.3d at 615 ("the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion' because a preliminary injunction is an extraordinary remedy." (quoting *Leary*, 228 F.3d at 739).

### D. Irreparable Injury

To show she will suffer an irreparable injury absent a preliminary injunction, Plaintiff relies on the following quote from the Sixth Circuit: "In *Elrod v. Burns,* 427 U.S. 347, 373 (1976), the Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell*, 241 F.3d at 809; *see* Doc. No. 20 at PageID 392. Yet, the mandatory irreparable injury mentioned in *Elrod* and *Bonnell* is inapt in the present case because Plaintiff has not clearly shown a likelihood of success on the merits of her First Amendment claim. *Cf. Gonzales v. Nat'l Bd. of Med. Exam'r*, 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one [preliminary injunction] factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."); *cf. also EOG Res., Inc.*, 135 F.4th at 883 ("Even if a plaintiff has shown a likelihood of success on the merits, 'a preliminary injunction does not follow as a matter of course.'" (quoting *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam)). Further, as Plaintiff acknowledged during her

17

testimony, no Board member, nor anyone associated with the Board, has indicated to her that she cannot speak at the next Board meeting. Doc. No. 17 at PageID 314. These considerations weigh against finding that Plaintiff has suffered an irreparable injury.

### E. The Balance of Equities and Public Interest

Where, as in the present case, "there is no likelihood of *either* success on the merits *or* irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (citing *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022).

### IV. Conclusion

Based on all the above reasons, the Court **DENIES** Plaintiff's motion for a preliminary injunction.

Pursuant to S.D. Ohio Civ. R. 16.3(a)(1), this case is referred to Magistrate Judge Caroline H. Gentry for mediation. The Court anticipates that mediation will occur within the next 30 days. The date for mediation shall be arranged directly with Magistrate Judge Gentry's Chambers. In the event the parties do not reach a settlement, the Court will issue an Order requiring the parties to meet and confer for the purpose of preparing and filing a Joint Proposed Scheduling Order.

**IT IS SO ORDERED**.

June 6, 2025                                              s/*Michael J. Newman*
                                                         Hon. Michael J. Newman
                                                         United States District Judge